UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| SOUTHERN COLLISION & | * | CIVIL ACTION NO.: |
| RESTORATION, LLC | * | |
| | * | |
| | * | SECT.: |
| VERSUS | * | |
| | * | |
| STATE FARM MUTUAL AUTOMOBILE | * | MAG.: |
| INSURANCE COMPANY, STATE FARM | * | |
| FIRE & CASUALTY COMPANY, and | * | |
| STATE FARM GENERAL INSURANCE | * | |
| COMPANY | * | |

*************************************************************************

## ORIGINAL COMPLAINT

NOW INTO COURT, through undersigned counsel, comes Plaintiff, who represents as follows in this Complaint:

### PARTIES

1.

Made plaintiff herein is:

    a. **Southern Collision & Restoration, LLC**, a domestic limited liability corporation domiciled in the Parish of Jefferson, State of Louisiana.

2.

Made defendants herein are:

    a. **State Farm Mutual Automobile Insurance Company**, a foreign insurer registered with the Louisiana Department of Insurance as an Illinois insurance company licensed to do business and is doing business within the State of Louisiana. This Defendant may be served with process through its registered

1

agent for service of process, the Louisiana Secretary of State, 8585 Archives Avenue, Baton Rouge, Louisiana, 70809.

b. **State Farm Fire and Casualty Company**, a foreign insurer registered with the Louisiana Department of Insurance as an Illinois insurance company licensed to do business and doing business within the State of Louisiana. This Defendant may be served with process through its registered agent for service of process, the Louisiana Secretary of State, 8585 Archives Avenue, Baton Rouge, Louisiana, 70809.

c. **State Farm General Insurance Company**, a foreign insurer registered with the Louisiana Department of Insurance as an Illinois insurance company licensed to do business and doing business within the State of Louisiana. This Defendant may be served with process through its registered agent for service of process, the Louisiana Secretary of State, 8585 Archives Avenue, Baton Rouge, Louisiana, 70809.

## JURISDICTION

3.

This Court has jurisdiction over this lawsuit under 28 U.S.C. §1332(a)(1) as the Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.  There is therefore complete diversity between the parties.

## VENUE

4.

Venue is proper under 28 U.S.C. §1391(a)(2), as the Eastern District of Louisiana is the district where a substantial part of the events giving rise to this claim occurred.

## FACTUAL BACKGROUND and CAUSES OF ACTION

5.

Defendants are indebted for Plaintiff's damages, together with legal interest thereon from the date of judicial demand until paid, and for costs in these proceedings, for the following, to-wit:

2

6.

Plaintiff is in the business of recovery and/or repair of motor vehicles involved in collisions. Plaintiff was previously part of the below-described direct repair program with Defendants.

7.

Each individual Defendant is an insurer providing automobile policies to consumers throughout the State of Louisiana and insureds/claimants having repairs performed by Plaintiff located within the State of Louisiana.

8.

Plaintiff has done business at various times over the course of years with the Defendants' policyholders and claimants by providing to these policyholders and claimants motor vehicle collision repair service. Each Defendant is individually responsible for payment for those repairs for their respective policyholders and claimants.

9.

Over the course of several years, the Defendants have engaged in an ongoing, concerted and intentional course of action and conduct to improperly and illegally control and depress automobile damage repair costs to the detriment of the Plaintiff and the substantial profit of the Defendants.

10.

One of the methods by which the Defendants exert control over Plaintiff is by way of entering program agreements with the individual auto repair shops. Such agreements are known generally and generically within the collision repair industry as direct repair programs ("DRPs").

11.

DRPs were presented to the auto repair shops as a mutually beneficial opportunity. In exchange for providing certain concessions of price, priority and similar matters, the individual Defendants would list the body shop as a preferred provider.

12.

However, the concessions demanded by the individual Defendants in exchange for remaining on the direct repair program were not balanced by purported benefits. The Defendants have utilized these agreements to exert control over the Plaintiff's business in a variety of manners, well beyond that of an ordinary business agreement.

13.

Defendants have engaged in an ongoing pattern and practice of coercion and implied threats to the pecuniary health of Plaintiff's business to force compliance with unreasonable and onerous concessions. Failure to comply results in either removal from the program (s) combined with improper "steering" of customers away from the Plaintiff' s business, or simply punishment to decrease the number of customers utilizing the Plaintiff's services.

14.

According to the Company Market Share Report, for the year ending December 2013, State Farm has captured 32.1% of the private passenger automobile insurance business within the market area of the State of Louisiana. State Farm holds the unchallenged dominant position within the automobile insurance industry in the Louisiana market.

15.

Much of Plaintiff's business is generated by customers for whom the Defendants are responsible to pay repair costs. The insurance-paying customers account for approximately seventy to ninety-five percent of an auto repair shop's revenue. Overall, courts have acknowledged the significant role played by insurance companies in funding automobile collision repairs, as well as the ability and market power to exert substantial influence and control over where consumers will take a wrecked car for repairs. See, e.g., *Allstate Ins. Co. v. Abbott*, 2006 U.S. Dist. LEXIS 9342 (N.D. Tex. 2006)(aff'd, *Allstate ins. co. v.Abbott,* 2007 U.S. App. LEXIS 18336 (5th Cir. 2007).

16.

As a general proposition, each DRP contains a general statement that the body shop will charge the respective insurance company no more for any particular repair than is the going market rate in the market area. However, shops–including Plaintiff–are not permitted to set their own rates.

17.

In order to establish the "market rate," State Farm utilizes what it terms "surveys." The geographical boundaries of the market area to be "surveyed" to establish the "market rate" are wholly within the control and direction of State Farm.

18.

Under the terms of its DRP, State Farm is not required to disclose any of the methods by which it establishes either the market area, the market rate, nor any other factual bases for its determination of the "market rate." The agreement contains no provisions for independent and neutral verification of the data utilized, nor any oversight not directly within the control and direction of State Farm. The auto repair shops, including Plaintiff, are simply required to blindly accept State Farm's pronouncements regarding these matters.

19.

Previously this "survey" was conducted by sending written documents to the individual shops. The owner or designated representative of the shop would fill out the survey and return it to State Farm. In recent years, this process has been transferred to an electronic forum, State Farm's Business to Business portal, whereby the shops go online to complete the "survey."

20.

State Farm does not perform a survey in the traditional scientific sense, where information is obtained and results produced establishing a baseline of all the shops' information. With respect to labor rates, as an example, State Farm's methodology does not represent what the majority of shops in a given area charge; quite the contrary. State Farm's methodology lists the shops in a given market (as determined by State Farm) with the highest rates submitted at the top of the list and descending to the least expensive hourly rates at the bottom.

21.

State Farm then lists how many technicians a shop employs or the number of work bays available, whichever is lesser. Those are then totaled and State Farm employs it's "half plus one" method. If, for example, a State-Farm-determined market area has a total of fifty (50) technicians or work bays, State Farm's "'half plus one" math equals twenty-six (26). With that number, starting at the bottom of the shop list, State Farm counts each shops' technicians or work bays until the "half plus one" number is reached, twenty-six in this example, and whatever that shop's rate happens to be is declared the market rate.

22.

There could, arguably, be some validity to this method, if it accounted for the variance in shop size, skill of technicians and other quality variables, which it does not. However, the greatest problem with this method is that State Farm can and does alter the labor rates input by the shops, decreasing those arbitrarily deemed too high-or higher than State Farm wishes to pay.

23.

By altering the rates entered, particularly those of the larger shops, those with the most technicians and/or work bays, State Farm manipulates the results to achieve a wholly artificial "'market rate." The results are, therefore, not that of an actual survey reflecting the designated market area but created from whole cloth by State Farm, particularly since State Farm determines the market area to be included.

24.

Furthermore, State Farm attempts to prohibit the shops from discussing with each other the information each has entered into the survey, asserting any discussion may constitute illegal price fixing. State Farm selects the geographical boundaries of the "survey," and State Farm retains the right to alter the "survey" results and does so without disclosure or oversight.

25.

Another electronic page on State Farm's business portal is known as the Dashboard/Scorecard. The Dashboard has substantive impact on several levels. It serves as the record of an individual shop's survey responses. It also provides a "report card" and rating of the individual shop based primarily upon three criteria: quality, efficiency and competitiveness.

26.

Within the quality criterion, the shop's reported customer satisfaction, customer complaints, and quality issues identified by an audit are scored.

27.

The efficiency criterion evaluates repair cycle time, number of days a vehicle is in the shop and by utilizing information input by the shops on the car's drop-off and pickup dates.

28.

The competitiveness criterion analyzes the average estimate for each State Farm repair, the cost of parts, whether a vehicle is repaired or replacement parts are utilized, the number of hours required to complete repair and similar matters.

29.

In rating an individual shop, a total score of 1000 is possible. However, State Farm is under no obligation to disclose the weight or total number of points possible given to each factor included in reaching the score, particularly those factors included under the competitiveness criterion. In fact, State Farm has refused to disclose its method of determining competitiveness even to its own team leaders.

30.

Due to this opacity, State Farm maintains complete and unsupervised authority to determine an individual shop's rating. It is therefore possible for a shop to have no customer complaints, high customer satisfaction, no issues identified on an audit, complete compliance with all repair cycle time and efficiency requirements and yet still have a low rating. It is also possible for a shop to have multiple customer complaints, poor customer satisfaction, numerous

issues identified on audit and complete failure to meet efficiency expectations and yet have a very high rating.

31.

The Dashboard rating is very important as a shop's rating determines its position on the list of preferred providers. When a customer logs on to the State Farm web site seeking a repair shop, those shops with the highest ratings are displayed first. A shop with a low rating will be at the bottom of the list often pages and pages down, making it difficult for a potential customer to find it. If a customer calls State Farm, the representative provides the preferred shops beginning with those holding the highest rating.

### SUPPRESSION OF LABOR RATES

32.

Among the questions asked by the "survey" is the individual shop's hourly labor rate. This information is supposed to be provided by the shop and to accurately reflect that shop's labor rate to allow State Farm to reach a "market rate." The actual method of determining a "market rate" is described above.

33.

If the labor rate information received is unilaterally deemed unacceptable by State Farm, a State Farm representative will contact the shop and demand the labor rate be lowered to an amount State Farm wishes to pay.

34.

If the body shop advises a labor rate increase is required, State Farm representatives will inform the body shop they are the only shop in the area who has raised its rates, therefore the higher rate does not conform with the "market rate" and will not be paid.

35.

At various points in time, State Farm has utilized this method of depressing labor rates, telling each shop they are the only one to demand a higher labor rate when, in fact, multiple shops have attempted to raise their labor rates and advised State Farm of such. By threatening shops with antitrust allegations, State Farm attempts to prevent shops from learning they are, in fact, not the only shop seeking to raise its rates and thus exposing State Farm's falsehoods and manipulation.

36.

Should a shop persist in its efforts to raise its labor rate, State Farm will take one or more of several "corrective" measures. It will go into the individual shop's survey responses and alter the labor rate listed without the knowledge or consent of the shop and use this lowered rate to justify its determination of the "market rate." It will threaten to remove the shop from the direct repair program to coerce compliance. It will remove the shop from the direct repair program.

37.

The net effect of this tactic is to allow State Farm to manipulate the "market rate" and artificially suppress the labor rate for the relevant geographic area, an area which, again, is defined solely by State Farm and is not subject to either neutral verification or even disclosure.

*SUPPRESSION OF REPAIR AND MATERIAL COSTS*

38.

Through various methods, the Defendants have, independently and in concert, instituted numerous methods of coercing the Plaintiff into accepting less than actual and/or market costs for materials and supplies expended in completing repairs.

39.

Some of these methods include but are not limited to: refusal to compensate the shops for replacement parts when repair is possible though strongly not recommended based upon the shop's professional opinion; utilizing used and /or recycled parts rather than new parts, even when new parts are available and a new part would be the best and highest quality repair to the vehicle; requiring discounts and/or concessions be provided, even when doing so requires the shop to operate at a loss; de facto compulsory utilization of parts procurement programs. In addition to the above, the Defendants have repeatedly and intentionally failed to abide by minimum industry standards for auto repairs. Three leading collision repair estimating databases are in ordinary usage within the auto body collision repair industry: a) ADP; b) CCC; and c) Mitchell.

40.

These databases provide software and average costs associated with particularized types of repairs to create estimates. The estimates generated by these databases include the ordinary and customary repairs, repair time (labor) and materials necessary to return a vehicle to its pre-accident condition. These databases and the estimates they generate are accepted within the industry as reliable starting points, subject to the shop's expert opinions and the necessarily present variability between the "best-case scenario" presented by the procedure databases and the actual needs of a particular repair.

41.

Over the course of years, the Defendants have admitted the accepted position of the estimating databases within the industry, but have nonetheless engaged in a course of conduct of refusing to make full payment for procedures and materials. In many instances the Defendants will refuse to allow the body shop to perform required procedures and processes, thereby requiring the auto repair shops, including Plaintiff, to perform less-than-quality work or suffer a financial loss.

42.

At the same time, Defendants selectively rely upon and assert the definitive nature of these databases when doing so is to their respective financial advantage. For example, when a particular repair requires twenty hours of labor to complete but the database estimate notes fifteen hours of labor is standard for that type of repair, Defendant will cite the database estimate and pay for only fifteen hours of labor time.

43.

With respect to materials, while it is inarguable that materials must be expended to repair automobile collisions, the Defendants simply refuse to pay for them, asserting materials are part of the cost of doing business. This is the Defendants' position even when the authoritative databases specifically state that such materials are not included in the repair procedure pages.

44.

The only partial exception to this practice is paint. While paint costs are factored into the amount the Defendants will pay, it is calculated via a formula which compensates the shops for only half the actual cost on average. The Defendants' method of calculating paint payment does not take into account the type of paint needed/used, the requirement that paint be mixed to match the existing color of the vehicle, the actual amount of paint required to complete the job, the type of vehicle involved or any other factor. Defendants pay only based upon arbitrary caps, self-established and unrelated to actual costs to the Plaintiff.

45.

This continued refusal and/or failure to compensate Plaintiff for ordinary and customary repairs and materials costs placed Plaintiff in the untenable position of either performing incomplete and/or substandard repairs or thus breaching their obligation to automobile owners to return vehicles to pre-accident condition, or performing labor and expending materials without proper compensation and thereby jeopardizing continuing viability of the business enterprise.

46.

Defendant State Farm also imposes restrictions upon the Plaintiff's ability to obtain and utilize quality replacement parts and materials. As part of its DRP agreement, State Farm asserts it has the unilateral authority to enter into separate agreements with manufacturers, distributors or suppliers of automotive parts, supplies or materials.

47.

Despite the fact that the shops have no involvement in the negotiation of those separate agreements, they are de facto required to abide by the pricing agreements reached, even if they do not make purchases with those vendors. Although presented as an option to participate, the optional language is rendered nugatory by additional language which requires the shops to accept as payment only that amount for which the parts and /or materials could have been obtained through those agreements. Participation or lack thereof is therefore completely meaningless and the optional language is illusory.

48.

Moreover, auto repair shops are required to "stack" this purportedly optional usage of separate agreements with other discounts required elsewhere within the agreement. Thus, the limitation on payment, refusal to compensate for nearly all materials and the compelled discounts result in a shop operating at or near a loss for each repair.

49.

Again, State Farm makes no distinction between DRP shops and non-DRP shops. Even the illusory promise of optional participation is absent. State Farm has enacted a wide-spread procedure of paying only the least amount for which a part *could* be obtained whether or not the least expensive part is appropriate or even purchased. Thus, if a bumper *could* be purchased from a vendor somewhere for $200.00, State Farm will only pay $200.00, even if the $200.00 bumper does not fit correctly and is not used.

*STEERING*

50.

The Defendants regularly and routinely engage in "steering" in order to punish the noncompliant auto repair shops, such as Plaintiff. Through several common methods, the Defendants will "steer" insureds and/or claimants to favored, compliant shops through misrepresentation, insinuation, delay and casting aspersions upon the business integrity and quality of disfavored repair centers.

51.

Examples of this practice include advising that a particular chosen shop is not on the preferred provider list, advising that quality issues have arisen with that particular shop, that complaints have been received about that particular shop from other consumers, that the shop charges more than any other shop in the area and these additional costs will have to be paid by the consumer, that repairs at the disfavored shop will take much longer than at other, preferred shops and the consumer will be responsible for rental car fees beyond a certain date, and that the Defendant cannot guarantee the work of that shop as it can at other shops.

52.

These statements have been made about certain auto repair shops, such as Plaintiff, without any attempt to ascertain the truth thereof. Some of the ills recited that implicitly criticize the shops are wholly attributable to the insurer itself. For instance, the statement that repairs will take longer at a disfavored shop--consumers are not told that the delay in beginning repairs is due to the insurer's decision to delay sending an adjuster/appraiser to evaluate the damage, a decision completely and wholly within the control of the Defendants. Asserting the shops charges more than other shops is often not a function of what the shop actually charges but the Defendants' refusal to pay, also a factor wholly and completely within the control of the respective Defendant. Yet both are conveyed to the public as problems with the shop.

53.

The most egregious of these statements, that the Defendant cannot guarantee the work of the shop, is particularly misleading as none of the Defendants offer a guarantee for repair work. Instead, the Defendants require the body shops to provide a limited lifetime guarantee on work performed. In the event additional work is required, the body shop is required to do so without any additional payment, or to indemnify the insurer for costs if work is performed at another shop.

54.

Thus, while it may be a facially truthful statement that an insurer cannot guarantee the work of a particular shop, the clearly understood inference is that it can and will guarantee the work of another, favored shop, which is simply not true.

55.

The Defendants specifically and maliciously target auto repair shops, such as Plaintiff, as retribution for noncompliance with the fixed prices unilaterally imposed by the Defendants. The actions are intentional, improper and conducted with deliberate malice.

### *INTENTIONAL NATURE OF DEFENDANTS' CONDUCT*

56.

In 1963, a consent decree was entered in *United States vs. Association of Casualty and Surety Companies*, et al, Docket No. 3106, upon complaint filed in the Southern District of New York. The allegations of that complaint included violations of Sections 1 and 3 of the Sherman Act, also known as the Sherman Antitrust Act.

57.

Specific actions supporting those allegations included: (1) requiring repair rather than replacement of damaged parts; (2) replacing damaged parts with used rather than new parts: (3) obtaining discounts on new replacement parts: (4) establishing strict labor time allowances; (5) suppressing the hourly labor rate; (6) channeling auto repairs to those repair shops which would abide by the insurer estimates and boycotting those which refused. The complaint further alleged

14

a conspiracy and combination in unreasonable restraint of trade and commerce for these practices.

58.

The Consent Decree order provided the following relief: (1) enjoined the defendants from placing into effect any plan, program or practice which has the purpose or effect of (a) directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any independent or dealer franchised automotive repair shop with respect to the repair of damage to automobile vehicles; (2) exercising any control over the activities of any appraiser of damages to automotive vehicles; (3) fixing, establishing, maintaining or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automotive vehicles or for replacement parts or labor in connection therewith, whether by coercion, boycott or intimidation or by the use of flat rate or parts manuals or otherwise.

59.

Whether or not any current Defendant is legally bound by this Decree, the actions described in the present cause fall squarely within those prohibited by the Decree. The Decree has been "on the books" for fifty years and is well-known within the insurance industry. Despite this, the Defendants have willfully ignored actual knowledge of the terms of the Consent Decree.

60.

Being known, it can only be said that Defendants were fully aware their actions, plans, programs, and combinations and/or conspiracy to effectuate the same prohibited actions have been willful, intentional and conducted with complete and reckless disregard for the rights of the Plaintiff.

### CLAIMS FOR RELIEF
### COUNT ONE: VIOLATION OF LOUISIANA UNFAIR TRADE PRACTICES ACT

61.

Louisiana Revised Statute § 51:1405, *et seq*., prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce. An act or practice violates this statute if it offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious. The policy behind the enactment of the Louisiana Unfair Trade Practices Act ("LUTPA") is to protect consumers and to foster competition.

62.

Defendants' actions as set out above violate this statute in the following, non-exhaustive ways: (A) refusal to pay and/or fully pay for necessary and required procedures and processes to return a vehicle to its pre-accident condition. This places the consumer at risk of physical injury or death while causing substantial pecuniary harm to the Plaintiff; (B) utilizing used and/or recycled parts in contravention of the repair shops' expert professional opinion in order to save money and thereby compromising the safety of both the driver and passengers as well as all other members of the traveling public; (C) requiring shops to purchase replacement parts of unknown manufacture, reliability, and/or quality merely because it is the least expensive option, again placing consumers at risk of physical injury or death while causing substantial pecuniary harm to the Plaintiff;

63.

The Defendants' repeated and ongoing breaches of the statute have caused financial harm to the Plaintiff, exposed the Plaintiff to potential liability for damages and/or injuries resulting from failure of improper replacement parts, failure to replace rather than repair parts when appropriate, and failure of poor quality parts of unknown or uncertain provenance. These actions violate public policy, place the traveling public at risk, and substantially impede competition.

## COUNT TWO: UNJUST ENRICHMENT

### 64.

Plaintiff incorporates and restates by reference herein all allegations set forth above.

### 65.

A quasi-contract, or constructive contract, is based on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another. In this respect the terms "unjust enrichment" and "restitution" are modern designations for the doctrine of "quasi-contracts" and the basis for an action for unjust enrichment lies in a promise, which is implied in law, that one will pay to the person entitled thereto which in equity and good conscience is his.

### 66.

It is an obligation created by law, in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money under circumstances that in equity and good conscience ought not be retained and which in justice and fairness belongs to another.

### 67.

In the present case, Defendants' insureds and claimants entrusted the Plaintiff with the full and complete repair of their vehicles, the cost of which it is incumbent upon the Defendants to pay. Statute requires the Defendant pay for the proper and fair repair of those vehicles. An obligation was thus created to provide payment to Plaintiff for their work and expended materials.

### 68.

By failing to make payment and/or full payment for the necessary and reasonable costs of repair, Defendants have obtained or retained money which, in equity and good conscience, rightfully belongs to the Plaintiff.

### COUNT THREE: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

69.

Plaintiff incorporates and restates by reference herein all allegations set forth above.

70.

Tortious interference with business relations occurs when a defendant engages in some act with malicious intent to interfere and injure the business of another. (*Sandolph v. P & L Hauling Contractors, Inc.,* 430 So. 2d 102, 103 (La. App. 5 Cir.1983)**.**

71.

The Defendants have repeatedly engaged in malicious actions and a course of conduct designed to interfere with and injure the Plaintiff's business relations and prospective business relations. The Defendants have repeatedly steered and attempted to steer customers away from the Plaintiff's respective business through their repeated campaign of misrepresentation of facts, failure to verify facts damaging or tending to cause damage to the Plaintiff's business reputations before conveying the same to members of the public, implications of poor quality efficiency, poor quality efficiency, poor business ethics and practices, and unreliability.

72.

The purpose of these actions was twofold: to punish the auto repair shops such as Plaintiff who complained about or refused to submit to the various oppressive and unilateral price ceiling the Defendants were enforcing upon them, and to direct potential customers of the Plaintiff to other vendors who would comply with the maximum price ceilings unilaterally imposed by the Defendants.

73.

Plaintiff has been damaged by the Defendants' malicious and intentional actions. Plaintiff is therefore entitled to compensation for these damages.

### COUNT FOUR: QUASI-ESTOPPEL

74.

Quasi-estoppel is an equitable principle. This long-standing doctrine is applied to preclude contradictory positions by preventing a person from asserting, to another's disadvantage, a right inconsistent with the position previously taken.

75.

The Defendants have relied upon and asserted the validity/authority of the databases, supra, when it has been to their respective advantage. Defendants have refused to compensate and/or fully compensate Plaintiff for materials expended and work performed, including labor and labor rates, upon reliance of these very same guides, claiming they are unnecessary to complete the work at hand.

76.

Defendants' inconsistent and contradictory application of, or refusal to abide by, the guidelines of the industry databases has created an atmosphere of doubt, uncertainty and distrust, all to the severe detriment of Plaintiff while, at the same time, seeking to obtain every improper advantage for Defendants themselves.

77.

Plaintiff therefore seeks to have the Defendants estopped from denying the applicability and reasonableness of the baseline procedures and costs set forth in the industry databases henceforth and make full payment for the necessary reasonable costs of repairs made for the benefit of Defendants' insureds and claimants.

### COUNT FIVE: CONVERSION

#### 78.

Plaintiff incorporates and restates by reference herein all allegations set forth above.

#### 79.

Plaintiff have performed necessary work and expended appropriate labor and materials for which Defendants have refused to make payment and/or full payment, even after demand for same. Defendants' action constitutes a conversion of Plaintiff's monies.

#### 80.

Defendants are therefore wrongfully in possession of monies which should have been expended to pay repair bills of their policyholders and claimants, specifically set aside for that purpose, and which rightfully belongs to Plaintiff as a result of Plaintiff performing necessary reasonable and customary repairs to vehicles.

### COUNT SIX: VIOLATIONS OF THE SHERMAN ACT-PRICE-FIXING

#### 81.

Plaintiff incorporates and restates by reference herein all allegations set forth above.

#### 82.

The Sherman Act prohibits contracts, combinations or conspiracies in restraint of trade, 15 U.S.C. §1. Such agreements are illegal if (1) their purpose or effect is to create an unreasonable restraint of trade, or (2) they constitute a per se violation of the statute.

#### 83.

Through parallel actions, and/or explicit agreement, the Defendants have formed and engaged in a vertical conspiracy or combination to impose maximum price limits upon the Plaintiff for their products and services.

84.

The United States Supreme Court has noted that agreements to fix maximum prices, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment. *Kiefer-Stewart Co. Vs. Joseph E. Seagram and Sons, Inc., 340 U.S. 211 (1951).*

85.

The Defendants and co-conspirators have engaged in combination and conspiracy in unreasonable restraint of trade and commerce in the automobile damage repair industry.

86.

The aforesaid combination and/or conspiracy has consisted of a continuing agreement in concert of action among the Defendants and co-conspirators to control and suppress automobile damage repair costs, automobile material repair costs through coercion and intimidation of these shops.

87.

Evidence of this conspiracy or combination include, but is not limited to, admission before witnesses that members of the insurance industry meet regularly to discuss such matters in and amongst themselves but refuse to allow members of the auto collision repair industry to attend those meetings, explicit statements by Defendants that they will conform to State Farm's unilaterally imposed payment structure, admitting the baseline application of the industry database but failing to conform to that minimum standard, followed by the uniformity of action by all Defendants.

88.

The aforesaid offenses have had, among others, the effect of eliminating competition within the automobile damage repair industry, elimination of some shops from a substantial segment of the automobile damage repair industry for refusing or attempting to refuse the Defendants' arbitrary price ceilings, and subjecting repair shops to collective control and supervision of prices by the Defendants and co-conspirators.

89.

Neither the Plaintiff, nor other members of the auto collision repair industry, are able to engage in competitive business practices as the Defendants have effectively and explicitly determined what their business practices will be.

90.

The Defendants actions individually and certainly collectively have violated federal law and directly caused the Plaintiff to incur substantial damages. Defendants are continuing and will continue said offenses unless the relief herein prayed for is granted.

## COUNT SEVEN: VIOLATION OF THE SHERMAN ACT-BOYCOTT

91.

Plaintiff incorporates and restates by reference herein all allegations set forth above.

92.

The United States Supreme Court has repeatedly held that boycotts constitute a violation of the Sherman Act, 15 U.S.C. §1. "'Boycott" has been defined within the antitrust law context as "pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target." *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541 (1978).

93.

The Defendants have engaged, and continue to engage, in boycott and boycotting activity through their repeated actions of steering customers away from the Plaintiff through allegations and intimations of poor quality work, of poor efficiency in performing work, of questionable business practices, of overcharging, impugning integrity, and similar actions so as to withhold and/or enlist others to withhold patronage from the Plaintiff.

94.

This boycott was specifically designed to pressure, intimidate, and/ or coerce the Plaintiff into complying with the maximum-price limitations unilaterally conceived by Defendants.

95.

It is irrelevant for purposes of the Sherman antitrust boycott activity that the Plaintiff and Defendants are not direct competitors within the same industry. The United States Supreme Court has directly addressed this issue in *St. Paul Fire and Marine Insurance Company*, supra, stating, "[B]oycotters and the ultimate target need not be in a competitive relationship with each other." 438 U.S. at 543.

96.

The enlistment of third parties as a means of compelling capitulation by the boycotted group has long been viewed as conduct supporting a finding of unlawful boycott. *Id.*

97.

In the present matter, the Defendants have engaged in not only a boycott, but have regularly, routinely and purposefully enlisted the aid of unwitting third parties in carrying out their boycott through their intentional acts of steering those customers away from the Plaintiff.

98.

Defendants' boycott was created and carried out with the sole purpose and intent of financially coercing and threatening the Plaintiff into complying with the Defendants price caps.

99.

The Defendants actions are violation of federal law and have directly caused the Plaintiff to incur substantial damages. Defendants are continuing and will continue said offenses unless the relief requested herein is granted.

***PRAYER FOR RELIEF***

100.

Plaintiff incorporates and restates by reference herein all allegations set forth above.

23

101.

As a result of the Defendants' actions, Plaintiff has been substantially harmed and will continue to suffer unless the relief requested herein is granted. The Plaintiff therefore prays for the following relief:

A. Compensatory damages for all non-payment and underpayment for work completed on behalf of the Defendants' insureds and claimants as determined by a jury.

B. Compensation for the lost revenue through artificial suppression of labor rates as determined by a jury.

C. Damages sufficient to compensate Plaintiff for lost business opportunities as determined by a jury.

D. Treble damages, reasonable attorneys' fees and costs for violations of the Sherman Act.

E. Injunctive relief prohibiting the Defendants from further engaging in any of the following:

(1) Placing into effect any plan, program or practice which has the purpose or effect of:

(a) directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any Plaintiff automotive repair shop with respect to the repair of damage to automobiles.

(b) fixing, establishing or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automobiles or for replacement parts or labor in connection therewith whether by coercion, boycott or intimidation, or by the use of flat rate or parts manuals or otherwise.

(2) Placing into effect any plan, program or practice which explicitly requires or has the purpose or effect of requiring Plaintiff to participate in any parts procurement program.

(3) Providing untruthful and/or unverified information to customers or third persons regarding the quality, cost, efficiency or reputation of any Plaintiff ("steering").

(4) Prohibiting Defendants from altering or amending any Plaintiff response to its market labor rate "survey" without the express written permission of the Plaintiff.

F.  Punitive and/or exemplary damages sufficient to punish Defendants for their intentional acts and deter each Defendant and similar entities from pursuing this improper conduct in the future.

G. Pre- and post-judgment interest.

H. Any additional relief the Court deems just and appropriate.

Respectfully submitted,

**HUBER, SLACK, THOMAS & MARCELLE**

_____*s/Charles M. Thomas*_____
**STEPHEN M. HUBER, BAR NO. 24463**
**CHARLES M. THOMAS, BAR NO. 31989**
**BRIAN P. MARCELLE, BAR NO. 25156**
1100 Poydras Street
Suite 1405
New Orleans, LA 70163
Stephen@huberslack.com
Charlie@huberslack.com
Bmarcelle@huberslack.com
ATTORNEYS FOR PLAINTIFF