**IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION**

| | |
|---|---|
| SOUTHERN COLLISION & RESTORATION, LLC, | * * * |
| PLAINTIFF, | * MDL Docket No. 2557 * |
| v. | * Case No. 6:14-cv-06005-GAP-TBS * |
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, *et al.*, | * Originally filed in the Eastern District * of Louisiana * |
| DEFENDANTS. | ***DISPOSITIVE MOTION** |

**CERTAIN DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT**

The Defendants listed in **Exhibit A** ("Defendants") move pursuant to Fed. R. Civ. P.

12(b)(6) to dismiss Plaintiff's First Amended Complaint ("FAC") with prejudice.

**MEMORANDUM OF LAW**

## I.     INTRODUCTION

Plaintiff Southern Collision's original complaint was brought only against State

Farm. Otherwise, however, that complaint was essentially identical to the antitrust and state-

law complaints brought by body shop plaintiffs in the cases subject to this MDL proceeding.

Plaintiff's FAC names over 50 new defendants, but in all other important respects it tracks

the amended complaints filed against many of these same defendants by body shop plaintiffs

in the other MDL cases. Plaintiff's allegations in support of its federal antitrust claims fail

for the same reasons as the antitrust claims in the second amended Florida, Indiana and Mis-

sissippi complaints. Unlike the original *Southern Collision* Complaint ("Original Com-

plaint"), the FAC offers some detailed allegations. However, the detail does not provide the

requisite factual support for and cannot salvage Plaintiff's implausible conspiracy and boy-cott theories repeated from the Original Complaint.  The FAC (i) continues to rely on allega-tions of unilateral conduct and conscious parallelism that cannot give rise to claims under Section 1 of the Sherman Act, 15 U.S.C. § 1; (ii) fails to correct the legal deficiencies identi-fied by this Court in its March 10 Order in this case (Doc. 30, *adopted* Doc. 34) and in its January 22, 2015 Order dismissing the first amended complaint in the companion *A&E Auto Body* case (*see A&E*, Doc. 293, adopted in this action at Doc. 30 at 18 and Doc. 34 at 4); and (iii) continues Plaintiff's pattern of impermissible group pleading.  The key features of the FAC are summarized below:

- Plaintiff has never alleged an express agreement among Defendants to set body shop reimbursement rates.

- The FAC relies on allegations that various Defendants, at different times, chose to follow some State Farm labor and material rate <u>increases</u>. Those allegations under-score State Farm's unilateral conduct followed by some parallel reimbursement con-duct on the part of some Defendants in some periods of time.

- The FAC purports to allege "plus factors," such as opportunities to conspire and prof-it seeking, but these allegations are substantively indistinguishable from the same conclusory allegations previously rejected by the Court.  Plaintiff's quixotic new the-ory that some Defendants have various relationships with the investment and asset management firm BlackRock lacks any factual or logical connection to a conspiracy claim.

- To support its group boycott claim, Plaintiff has added allegations that a single De-fendant steered an insured to a DRP shop and vague allegations that Defendants gen-erally engaged in purported steering.  Plaintiff asserts that these generalized allega-tions of steering, which purportedly began eight years ago, support its sweeping claim that all Defendants have engaged in an unlawful boycott.  There are, however, no fac-tual allegations to support the claim that all Defendants conspired to refuse to deal with Plaintiff. The FAC fails even to allege conduct that could fairly be described as parallel.  Moreover, the FAC does not state a boycott claim for the same fundamental reason that the previous iteration fell short – steering is not equivalent to a concerted refusal to deal.  Indeed, the allegations make clear that Plaintiff continues to do busi-ness with Defendants, so there has clearly been no "boycott" at all.

101337245.1

- Plaintiff has larded the FAC with apparent new claims that Defendants have conspired to fix the prices of replacement parts and to require shops to use aftermarket, salvaged, or recycled parts. Plaintiff does not tie any of these allegations to any agreement among Defendants regarding reimbursement rates or otherwise; they fail even to allege parallel conduct. These allegations also employ the same collective pleading technique which the Court has previously rejected.

This is the most recent of numerous iterations of essentially identical conspiracy claims filed in this and other actions in this MDL. Plaintiffs in this and the other MDL cases continue to fall far short of "nudg[ing]" their antitrust conspiracy claims "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). It is now clear that, no matter how many tries they get and no matter how many pages of allegations they draft, Plaintiff cannot state a claim for antitrust conspiracy against Defendants. Plaintiff's Sherman Act claims therefore should be dismissed with prejudice.

Plaintiff's state law claims should likewise be dismissed with prejudice:

- Plaintiff's second attempt to state a claim for tortious interference with business relations fails to remedy the deficiencies of its Original Complaint. Plaintiff continues to rely primarily on conclusory and generalized group pleading. As this Court has recognized, such collective pleading is insufficient to state a claim. The FAC adds only a single alleged specific instance of purported tortious interference involving just one Defendant. That single allegation does not show the requisite element of malice and underscores Plaintiff's failure to plead key elements of tortious interference as a matter of Louisiana law.

- Plaintiff's second attempt to plead an unjust enrichment claim is just as legally insufficient as its previous attempt. Plaintiff's claim fails because Plaintiff has not enriched or conferred a benefit upon Defendants and there has been no impoverishment of Plaintiff.

## II.  PLAINTIFF'S ANTITRUST CLAIMS (COUNTS ONE AND TWO) SHOULD BE DISMISSED.[1]

### A.  Plaintiff's New Conspiracy Allegations Fail to Overcome the Shortcomings of Its Original Complaint.

To survive a motion to dismiss, a plaintiff alleging an antitrust conspiracy must adequately plead that the defendants "(1) entered into 'a contract, combination or conspiracy,' which was (2) 'in restraint of trade or commerce' and (3) that [the plaintiff] was damaged by the violation." *Moecker v. Honeywell Int'l, Inc.*, 144 F. Supp. 2d 1291, 1300 (M.D. Fla. 2001) (citation omitted).  Plaintiff still fails to satisfy the first prong of this test because it has not alleged a plausible conspiracy among all or any Defendants.

The FAC must, but does not, contain "'allegations plausibly suggesting (not merely consistent with) [a conspiracy or] agreement,'" *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1332-33 (11th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)), and must, but does not, offer "'enough factual matter (taken as true) to suggest that an agreement was made.'"  *A&E*, Doc. 293 at 17 (quoting *Twombly*, 550 U.S. at 556).  Allegations "that are 'consistent with conspiracy, but just as much in line with . . . rational and competitive business strategy' are insufficient."  *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1308 (S.D. Fla. 2010) (quoting *Twombly*, 550 U.S. at 554).  "'[F]ormulaic recitations' of a conspiracy claim" are insufficient, and "'a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.'"  *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1294 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 557).

---

[1] Defendants hereby adopt and incorporate the legal standards for a Rule 12(b)(6) motion set out in the Court's March 10, 2015 Report and Recommendation (Doc. 30 at 5, *adopted* Doc. 34).

4

**1.    The FAC's Allegations of Conscious Parallelism Do Not Suggest a Conspiracy to Fix Reimbursement Rates.**

Plaintiff alleges that Defendants imposed maximum labor rates for automobile repair services.  The "crucial question," however, remains "whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" *Twombly*, 550 U.S. at 553; *see also Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1298-99 (11th Cir. 2003) ("[I]t is important to distinguish at the outset between collusive price fixing, i.e., a 'meeting of the minds' to collusively control prices, which is prohibited under the Sherman and Clayton Acts, and 'conscious parallelism,' which is not.").

Like its predecessor and like the *A&E* and *Capitol Body* second amended complaints, the FAC fails to meet the standards set by the Supreme Court and the Eleventh Circuit for pleading an antitrust conspiracy.  The rate-fixing conspiracy alleged in the Original Complaint was based entirely on Plaintiff's general characterization of the State Farm defendants' conduct as conscious parallelism, without so much as a single factual allegation that there were parallel rate reimbursement levels set by any Defendants.  The FAC has added some allegations of episodic instances in which some, but not all, Defendants paid similar prices for repairs.  This Court has already explained, however, that such parallel conduct "falls short of conclusively establishing agreement or itself constituting a Sherman Act offense."  *A&E*, Doc. 293 at 16.  In dismissing the antitrust conspiracy claims in the *A&E* case, this Court noted that, "aside from conclusory allegations that it exists, the Plaintiffs offer no details at all in the Amended Complaint about the alleged agreement, such as how the Defendants entered into it, or when."  *Id.* at 17.

5

Plaintiff has not cured these defects.  It still does not offer any factual allegations to support the conclusion that there was a conspiracy among the Defendants.  There are no allegations as to who reached an agreement with whom, what that agreement entailed, or when it began or ended.  Plaintiff's allegation that the supposed parallel conduct has been going on for at least 20 years (FAC ¶ 238), apparently in thousands of widely varied collision repair transactions, merely underscores the implausibility of its conspiracy theory.  None of the newly added allegations in the FAC, separately or in context, raise a suggestion of a preceding agreement among Defendants to fix reimbursement rates.  There is no factual context to suggest that Defendants agreed with State Farm or among themselves to adopt State Farm's rate reimbursement levels.  Indeed, Plaintiff's core allegation remains the self-defeating generalization that after State Farm, the alleged market leader, unilaterally developed and adopted a price structure for labor rates, other Defendants at some point thereafter individually refused to pay any more than State Farm.

Plaintiff does not allege sufficient factual matter to place this conduct in a "context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557.  Thus, there are no factual allegations supporting an inference that the parallel reimbursement rates resulted from a preceding agreement among the Defendants.  Because conclusory allegations and recitals of the elements of a cause of action are not presumed true at the pleading stage, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), Plaintiff has not, and plainly cannot, set forth factual allegations plausibly establishing an antitrust conspiracy.

Plaintiff does not allege what any insurer paid Plaintiff itself for services, and on ex-

amination, even Plaintiff's allegations of supposed parallel business conduct reflect incon-

sistent behavior among Defendants.  For instance, it claims that State Farm determined that

the market rate in Bossier City was $48 per hour in 2011, but it alleges that only fourteen of

the other 56 Defendants paid the same rate.  (FAC ¶¶ 228-29.)  Moreover, Plaintiff alleges

that eight Defendants raised their reimbursement rates within one to two months of State

Farm changing its rates.  (*Id.* ¶ 236.)  (Other Defendants, apparently, did not follow State

Farm's rate changes at all.)

Plaintiff surmises from these inconsistent instances of parallelism that the rates paid

by State Farm "could only have been provided by State Farm's internal and unpublished

numbers to the other Defendants."  (*Id.* ¶ 237.)  Plaintiff does not account for why, in service

of a purported scheme to suppress reimbursement rates, Defendants would gradually raise

their rates, over a period of weeks or months, in response to State Farm's announcement of

its own independent rate increase.  It also does not allege when, how, by what means or to

whom State Farm provided such information to the other Defendants, or that other Defend-

ants agreed to use the same rates, nor does it allege that any Defendants possessed this in-

formation before State Farm raised the rates it paid to shops.[2]

State Farm is alleged to be the market leader (FAC ¶ 128) and to unilaterally set the

prices it will pay for repairs based on its regularly conducted survey (*see id.* ¶¶ 207-15).

Merely following a price leader is common within different industries and does not suggest

the existence of an agreement.  *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d

---

[2] Tellingly, Plaintiff's claim that "the Defendants all raise their 'market rates' contemporaneously or within days of State Farm raising their rates"" (FAC ¶ 430) actually refers to eight Defendants agreeing to pay higher rates 30-60 days after State Farm began paying higher rates to body shops. (*See id.* ¶ 236.)

896, 910 (6th Cir. 2009) (explaining that, "'as will often be the case, the leader's price in-
crease is likely to be followed'" and concluding that "each defendant's decision to match a
new commission cut was arguably a reasoned, prudent business decision" (citation omitted));
*Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) ("merely charging, adopt-
ing or following the fees set by a Consortium is insufficient as a matter of law to constitute a
violation of Section 1 of the Sherman Act"); *Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660
F.2d 1195, 1200 (7th Cir. 1981) (conspiracy not inferable from Defendants' "adherence to a
'common formula' for calculating damage estimates" for automobile repairs).

Plaintiff focuses many allegations on State Farm's surveys, but it does not allege that
State Farm's surveys involved anything other than State Farm's unilateral conduct or that any
Defendant implemented a price change before State Farm implemented its survey results.
(FAC ¶ 207.)  Plaintiff affirmatively alleges that State Farm took measures to protect the con-
fidentiality of its surveys (*id.* ¶¶ 224-25), not that it used the surveys to communicate with
other Defendants about rates.  In any event, the other Defendants did not need to know any of
that information or to conduct their own surveys to know what State Farm and other insurers
actually paid body shops.

As in *Twombly*, there are obvious explanations for why rational and self-interested in-
surers would know the rates paid by their competitors.  Plaintiff alleges that Defendants en-
gage with Plaintiff and with other body shops in hundreds of transactions every day in the
ordinary course of business.  The rates body shops are paid are an integral part of these trans-
actions.  Body shops doing business with State Farm across Louisiana, including Plaintiff, all
would learn in the ordinary course of business what rates State Farm was willing to pay

8

them, just as they would know the rates paid by other insurers with whom they do business. Moreover, these rates allegedly are static for years at a time. (FAC ¶ 401.) Thus, it is both obvious and entirely reasonable that the rates State Farm paid were well known among both body shops and the insurers with whom they regularly transact, and that alleged knowledge does not suggest a conspiracy.

Plaintiff's contention that the other Defendants "cannot be cognizant of any purported changes in the market" and that the data "could only have been provided by State Farm to its ostensible competitors" is plainly wrong. (*Id.* ¶¶ 234, 436.) Shops would have been told the rates resulting from the State Farm survey, if not the methodology, when State Farm told them what rates it was willing to pay. (*See, e.g.*, *id.* ¶¶ 218, 228, 231, 233, 236.) Plaintiff's allegations also suggest that insurers would learn competitive pricing information in the implementation of DRP agreements, which purportedly require pricing concessions or most favored nations provisions that oblige shops to charge no more than what other insurers pay for the same services. (*Id.* ¶¶ 173, 177, 188.) Thus, it is likely if not inevitable that State Farm's rates would be known among both body shops and the insurers with whom those shops did business. *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) ("Similar contract terms can reflect similar bargaining power and commercial goals (not to mention boilerplate); similar contract language can reflect the copying of documents that may not be secret; similar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy . . . . ").

Moreover, in a case purporting to be about a conspiracy to suppress rates, the FAC's sole factual allegation of parallel price moments involves Defendants <u>increasing</u> rates, to the

9

benefit of body shops, not decreasing them.  (FAC ¶ 236.)  The body shops themselves obviously knew what rates State Farm was paying them and almost certainly would have been eager to tell other insurers refusing to pay more than the market leader that the market leader had increased the rates it was willing to pay.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 329 (3d Cir. 2010) ("The details of commission agreements with other insurers, for example, could be a powerful tool for a broker attempting to negotiate a more favorable agreement with a particular insurer-partner.").  The decisions of those insurers to increase their own rates after State Farm had increased its own market rate hardly indicate the presence of an agreement to suppress the rates (and in any event certainly did not prejudice Plaintiff).  *See In re Travel Agent*, 583 F.3d at 907 (refusing to infer conspiracy where Defendants were not alleged to have received information about rate reductions before they were implemented).  If anything, this example tends to show that pricing movements in the market are the result of independent rather than concerted action.

As the Seventh Circuit has stated, "'the practice of the insurance companies to calculate the reimbursement for its insured based upon the lowest prevailing price in the market place (and to insure the integrity of that estimate by having an open list of competing shops which will generally accept it) is the very essence of competition.'"  *Quality Auto Body*, 660 F.2d at 1205 (citation omitted); *see also In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir. 1999) ("Gathering competitors' price information can be consistent with independent competitor behavior."); *In re Citric Acid Litig.*, 191 F.3d 1090, 1103 (9th Cir. 1999) ("There are many legal ways in which Cargill could have obtained pricing information on competi-

tors.").[3]

In short, Plaintiff's factual allegations of quasi-parallel conduct permit no inference other than that it was in the rational, independent business interests of State Farm to demand lower prices and of the other insurers to refuse to permit a body shop to charge them more than the shop was charging State Farm.  *See Twombly*, 550 U.S. at 554 (allegations that are "consistent with conspiracy, but just as much in line with . . . rational and competitive business strategy" do not suffice).  In dismissing the Complaint, this Court adopted its analysis of the factually indistinguishable allegations in the *A&E Auto Body* case, where it ruled that Plaintiff's allegations of purported statements by insurers that they would pay no more than State Farm did not give rise to an inference of a prior agreement:

> It is not illegal for a party to decide it is unwilling to pay a higher hourly rate than its competitors have to pay, and the fact that a number of the Defendants made statements to that effect does not tip the scales toward illegality. . . . Without more, statements such as these suggest that the party is acting out of its own economic self-interest rather than because of an agreement to fix prices, as required to violate § 1. . . .  Plaintiffs themselves suggest that the Defendants might have been acting in response to perfectly lawful motivations.

*A&E*, Doc. 293 at 18.  Plaintiff has not provided any new allegations in the FAC that would

---

[3] Presumably referring to – and mischaracterizing – allegations contained in other complaints discussing supposed statements by a USAA representative in Oklahoma, Plaintiff alleges that "Defendant representatives from other states have specifically stated that State Farm sends out its survey results to other insurers which prompts changes in the fixed labor rates paid to body shops." (FAC ¶ 436.)  The actual allegation to which Plaintiff refers claims that a single USAA representative told an Oklahoma body shop that USAA would soon pay *higher* labor rates because State Farm survey results "had just been sent out" and it would "take USAA a couple of weeks to put them in motion."  (*See* Amended Compl., *Indiana AutoBody*, No. 6:14-cv-06001, Doc. 150, ¶ 182.)  This allegation concerns a rate increase, so even taken at face value, it offers Plaintiff little help. Moreover, the initial allegations do not include facts that explain how the purported statement is relevant to rates outside Oklahoma, who sent these results, or when and to whom, or how general dissemination of the results supports an inference of conspiracy.  In short, the inference Plaintiff insists must be drawn simply does not flow from the words that allegedly were said to some unidentified body shop employee in Oklahoma, nor is there any factual support for such an inference.

alter this conclusion in the present case.[4]

 2.  **The FAC Does Not Allege Any Factual Plus Factor Supporting a Plausible Inference of Conspiracy.**

The FAC provides no details regarding the supposed agreement or any "specific time, place, or person involved in the alleged conspiracies." *See Twombly*, 550 U.S. at 565 n.10. Plaintiff also does not offer any "plus factors" that might make it plausible to infer a conspiracy from the alleged parallel conduct. *See id.* at 556 n.4 (discussing examples of plus factor allegations that might suffice to plead conspiracy); *Williamson Oil Co.*, 346 F.3d at 1301 ("[P]rice fixing Plaintiffs must demonstrate the existence of 'plus factors' that remove their evidence from the realm of equipoise and render that evidence more probative of conspiracy than of conscious parallelism."). Plaintiff simply recycles, at somewhat greater length, the conclusory allegations this Court previously rejected.

 a.  Opportunities to Conspire (FAC ¶¶ 345-69)

In support of its theory that 56 different insurers conspired to fix the prices they would agree to pay for auto repairs throughout Louisiana, Plaintiff points to Defendants' membership in various trade associations and standard-setting organizations. (*See* FAC ¶¶ 346-64.) Unspecified meetings of these associations, Plaintiff speculates, could have served

---

[4] Plaintiff now alleges that an unidentified "State Farm employee" stated that "'every iota'" of the Louisiana Attorney General's action against State Farm "'is the truth . . . when you read [the complaint], it's like, that "that's us."'" (FAC ¶ 221.) This purported recitation of the anonymous employee's personal opinion is too vague to provide any indication of which allegations this unspecified employee supposedly thinks are accurate or why the employee should be supposed to have any knowledge of the truth or falsity of any particular allegations. Moreover, the action brought by the Attorney General of Louisiana alleges unilateral conduct by State Farm and asserts only unfair trade practices and an intra-corporate conspiracy among State Farm entities, not a conspiracy between State Farm and any outside insurance companies. This supposed admission thus gets Plaintiff no closer to satisfying its pleading obligations than it was before.

as opportunities for high-level executives and officers of Defendants to get together and form a conspiracy.  (*See id.* ¶¶ 350, 352-53, 358, 364.)

Contrary to Plaintiff's claims, mere opportunities to conspire at trade association meetings do not plausibly suggest an agreement, particularly where the Defendants had an independent, rational reason to be at the alleged meeting place.  *See Am. Dental Ass'n*, 605 F.3d at 1295 ("participation in trade organizations provides no indication of conspiracy"); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 349 (affirming dismissal where "neither defendants' membership in the CIAB, nor their common adoption of the trade group's suggestions, plausibly suggest conspiracy"); *In re Travel Agent*, 583 F.3d at 911 ("[A] mere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement because [Defendants'] presence at such trade meetings is more likely explained by their lawful, free-market behavior.").  As this Court has explained, the fact that "State Farm and unnamed members of the 'insurance industry' meet regularly does not suggest that any Defendant insurance company entered into a price-fixing agreement."  *A&E*, Doc. 293 at 17 n.11.[5]

Moreover, Plaintiff has not alleged facts that could have created an opportunity to conspire in the first place.  It does not list or describe a single meeting of any of these associations, who attended, when it occurred, what contacts or communications occurred, or how

---

[5] Plaintiff alleges that "Defendant insurers meet regularly and State Farm has disclosed the Defendant insurers discuss and strategize with each other payment of body shop charges at these regular meetings."  (FAC ¶ 436.)  The FAC contains no allegations elaborating on this supposed disclosure.  Presumably, Plaintiff is referring to allegations contained in companion complaints concerning a State Farm meeting with representatives of the Mississippi Department of Insurance and body shop representatives, at which a State Farm employee allegedly referred to monthly insurance industry meetings and said that he would raise the body shops' concerns at these meetings.  This Court already has dismissed these allegations as supporting neither Plaintiff's characterization of the allegations here nor the inference of conspiracy Plaintiff seeks to draw.  *See A&E*, Doc. 293 at 17 n.11.

any of these unspecified contacts or communications might be substantively, temporally, or causally related to any of the purported parallel conduct that Plaintiff alleges.  *See In re Travel Agent*, 583 F.3d at 910 (affirming dismissal where complaints did "not cite any specific meetings that involved both [Defendants]").[6]

b.   Common Motive to Conspire (FAC ¶¶ 445-78)

As before, the only motive Plaintiff offers for the alleged price-fixing conspiracy is that it would be profitable for Defendants to pay less for repairs.  (*See* FAC ¶ 370.)  A profit motive is not sufficient to articulate a common motive to conspire.  *See, e.g.*, *White v. R.M. Packer Co.*, 635 F.3d 571, 582 (1st Cir. 2011) ("Taking as a given that all of the defendants had motive to conspire with one another to earn high profits, all such a motive shows is that the defendants could reasonably expect to earn higher profits by keeping prices at a supracompetitive level through parallel pricing practices.").

As this Court noted in dismissing the Original Complaint, the parallel pricing conduct alleged by Plaintiff is in the independent, profit-maximizing self-interest of each defendant insurer, which renders Plaintiff's conspiracy claim implausible.  *See A&E*, Doc. 293 at 18; *see also Jacobs*, 626 F.3d at 1342 ("Jacobs had the burden to present allegations showing why it is more plausible that TPX and its distributors—assuming they are rational actors act-

---

[6] Only seven Defendants are members of the American Insurance Association (FAC ¶¶ 346-47), and only seven are members of the Property Casualty Insurers Association of America (*id.* ¶¶ 347-48).  Only four are alleged to be members of the Certified Automotive Parts Association (CAPA) (*id.* ¶ 363), which also includes body shop members – making its attractiveness as a conspiracy-planning location doubtful at best.  Only three are alleged to be members of the National Association of Mutual Insurance Companies (NAMIC).  (*Id.* ¶ 348.)  State Farm, which purportedly plays "a leading role" in the conspiracy (*id.* ¶ 129), belongs only to CAPA, NAMIC, and the Insurance Institute for Highway Safety ("IIHS").  (*Id.* ¶¶ 348, 357, 363.)  Contrary to Plaintiff's allegation (*id.* ¶ 416), NAMIC is not a party to the 1963 Consent Decree.  (*See* Doc. 36-5.)

14

ing in their economic self-interest—would enter into an illegal price-fixing agreement (with the attendant costs of defending against the resulting investigation) to reach the same result realized by purely rational profit-maximizing behavior.").

In the FAC, Plaintiff has attempted to piece together a tenuous theory that some Defendants were somehow incentivized to conspire because they have relationships with BlackRock.  (FAC ¶¶ 378-90.)  Specifically, Plaintiff alleges that six Defendants invest "in or through" BlackRock, an asset management firm that manages over $4.32 trillion.  (*Id.* ¶¶ 380-81.)  Plaintiff claims, among other things, that Defendants profit by steering customers to a collision repair multi-shop operator, Service King, which was purportedly purchased from Carlyle Group by BlackRock.  (*Id.* ¶ 382.)  Plaintiff's allegations rest on a blatant misstatement of fact.  Service King was purchased from Carlyle Group by Blackstone – not BlackRock.[7]  Defendants suggest no further response to the Service King-related allegations could possibly be warranted, but even if they were not blatantly false, the allegations hardly suggest a common motive to conspire to set reimbursement rates.

Plaintiff's concoction of the BlackRock scheme continues, however.  Plaintiff also alleges that BlackRock owns shares of a paint manufacturer, PPG Industries.  (FAC ¶ 388.)

---

[7] The Court may take judicial notice of these press releases and articles under Fed. R. Evid. 201 because the ownership of Service King is not subject to reasonable dispute, is generally known, and can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned.  *See Ritter v. Hughes Aircraft Co.*, 58 F.3d 454, 458-59 (9th Cir. 1995) (taking judicial notice of facts in a newspaper article because they would be generally known and easily verified); *Peters v. Del. River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1357 (3d Cir. 1994) ("While not critical to our holding, we take judicial notice of newspaper accounts highlighting controversies over the DRPA's toll increases, spending practices, and public announcements.").  *See also* Blackstone, *Press Release: Blackstone to Acquire Majority Stake in Service King Collision Repair Centers* (July 23, 2014), http://blackstone.com/news-views/press-releases/details/blackstone-to-acquire-majority-stake-in-service-king-collision-repair-centers; Service King, *Press Release: Blackstone Acquires Majority Share of Service King Collision Repair Centers* (July 21, 2014), http://serviceking.com/news/67-blackstone-acquires-majority-share-of-service-king-collision-repair-centers.

However, Plaintiff does not allege that any Defendants have required that a specific type of paint be used, let alone PPG's paint. (*Id.* ¶¶ 388-90.) Moreover, Plaintiff's contrived theory includes no allegation of how Defendants coordinated or could have coordinated their collision repair decisions through BlackRock, and no allegation that they had any say in BlackRock's investment decisions.

c.    <u>Action Against Self-Interest (FAC ¶¶ 393-96)</u>

The FAC adds no coherent allegations that would show why, absent an agreement, it would be irrational for an insurer to ask body shops to lower their labor rates to the levels they charge a different insurer. *See Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) ("buyers try to bargain for low prices, by getting the seller to agree to treat them as favorably as any of their other customers" and "that is the sort of conduct that the antitrust laws seek to encourage"). Defendants set the amounts they will pay to reimburse for repairs regardless of which body shop their policyholders choose, and Plaintiff concedes that even when a shop wants to charge higher rates, Defendants simply refuse to reimburse for the higher charges. (*See, e.g.*, FAC ¶¶ 185, 191, 195-97, 239, 268, 282.) Plaintiff offers nothing to suggest that the ability or decision of a Defendant to refuse to pay these higher prices depended on the actions of other insurers.

> **3.**    **Plaintiff's New Allegations Regarding Prices of Replacement Parts, Types of Parts Used, and Reimbursement Policies for Various Repair Procedures Do Not Set Forth a Purported Price-Fixing Claim.**

Plaintiff has added or expanded a number of allegations concerning Defendants' payments for replacement parts (as distinguished from body labor or paint and materials rates), certain repair processes and procedures, and requirements for use of allegedly "sub-

16

standard or dangerous" replacement parts.  (FAC ¶¶ 119, 242.)[8]  The FAC does not tie any of

these allegations to any agreement by Defendants regarding parts reimbursement rates or pol-

icies.  To the contrary, these new allegations only underscore differences among the alleged

reimbursement practices and parts replacement decisions of Defendants, rendering any al-

leged conspiracy or agreement implausible.[9]  *See In re Elevator Antitrust Litig.*, 502 F.3d at

50-51 (affirming dismissal of claim that Defendants conspired to fix the various terms of ele-

vator repair parts and services for failure to show any parallel conduct in the first place).

Plaintiff's suggestion that the FAC's allegations entitle it to discovery that will enable

it to repair the deficiencies in its claim (FAC ¶ 241) is wholly unwarranted.  In the absence of

"allegations that reach the level suggesting conspiracy" and of any "'reasonably founded

hope that the [discovery] process will reveal relevant evidence' to support a § 1 claim," al-

lowing this case to proceed to enormously expensive antitrust discovery would contravene

the dictates of *Twombly*.  550 U.S. at 559-60 (alteration in original) (citation omitted).  In-

---

[8] The FAC is also replete with a catalog of other body shop grievances and accusations concerning matters having no apparent logical relationship to Plaintiff's claims.  Examples include DRP indemnity agreements (FAC ¶¶ 179, 181, 192-93), "desk review" claims processes (*id.* ¶ 260), and disclosures of aftermarket parts.  (*Id.* ¶¶ 292-301).  These irrelevant allegations of various supposed practices by different insurers also are inconsistent with any notion of parallel conduct by Defendants.

[9] With respect to the type of replacement parts the shops are required to use, some Defendants write estimates specifying the use of "aftermarket" (non-OEM) parts.  (FAC ¶ 150.)  Other Defendants allegedly specify salvage parts.  (*Id.*)  Yet other Defendants are "exceptions."  (*Id.*)  With respect to parts procurement, some Defendants require parts to be ordered through the Parts Trader electronic marketplace.  (*Id.* ¶¶ 151-52.)  Other Defendants order the parts themselves and ship them to the body shop.  (*Id.* ¶ 155.)  Still others tell the body shop which part to order from which vendor.  (*Id.*)  With respect to reimbursement practices, Plaintiff alleges that Defendants base their estimates on different estimating software programs or independent appraisers.  (*Id.* ¶ 251.)  Defendants' decisions to reimburse for certain procedures also are based on different methods and appear to vary depending on the circumstances.  (*See id.* ¶¶ 255, 257-58, 260-62.)  Such pervasive variations hardly support even the FAC's general allegations of parallel conduct, much less give rise to a plausible inference of conspiracy or agreement.

deed, given Plaintiff's "repeated failure to cure deficiencies by amendments previously al-lowed," *Goldstein v. MCI WorldCom*, 340 F.3d 238, 254 (5th Cir. 2003), Plaintiff's antitrust conspiracy claims should be dismissed with prejudice as a matter of law.

### B.      The FAC's Boycott Allegations Are Insufficient As a Matter of Law.

Count Two should be dismissed for the independent reason that Plaintiff's allegations – which are far weaker even than the insufficient allegations in the other MDL plaintiffs' complaints – do not set forth a cognizable group boycott as a matter of law.  A group boycott under the antitrust laws requires proof of a "concerted *refusal*" to deal.  *Quality Auto Body*, 660 F.2d at 1206; *Mendelovitz v. Adolph Coors Co.*, 693 F.2d 570, 577 (5th Cir. 1982) (emphasis added).  The conduct that Plaintiff alleges in apparent support of its boycott claim includes a stray allegation that a single Defendant attempted to steer a single insured to another shop and vague allegations that Defendants generally engaged in purported steering. (FAC ¶¶ 306-30.)  However, steering is not equivalent to a refusal to deal and, accordingly, cannot support a boycott claim.[10]  Plaintiff's vague allegations concerning the purported impact of the alleged misconduct on its volume of business (*id*. ¶ 338) contradict the notion that even individual Defendants refuse to deal with Plaintiff and are in any event far too

---

[10] *See also Quality Auto Body*, 660 F.2d at 1206 (even if two insurers agreed to refuse to pay more than competitive price for automobile repairs, that agreement did not constitute a boycott); *Custom Auto Body, Inc. v. Aetna Cas. & Sur. Co.*, 1983 WL 1873, at *19 (D.R.I. Aug. 3, 1983) (body shop "at all times has been free to compete for the business of the defendant and its insureds by offering lower prices or higher quality services"); *Nationwide Mut. Ins. Co. v. Auto. Serv. Councils of Del., Inc.*, 1981 WL 2053, at *2-4 (D. Del. Apr. 10, 1981) (discouraging insureds from using body shops "by telling them that their prices were too high, and by notifying the owners that Nationwide would not guarantee full reimbursement" did not constitute refusal to deal; there was "no suggestion of an outright refusal of Nationwide to deal with any repair shop," rather Nationwide had "simply refused to accede to what it considers to be Defendants' excessive prices").  Plaintiff cannot cure the deficiencies of its boycott claim by invoking the word "coerce."  (FAC ¶ 446.)  None of the alleged conduct comes close to coercion.  *See Nationwide Mut.*, 1981 WL 2053, at *3 ("driving a hard bargain . . . hardly constitutes a form of 'coercion' cognizable under the antitrust laws").

abstract to suggest that all or any Defendants instituted a boycott.

In addition, as discussed above, there is no legally cognizable allegation of concerted action with respect to the alleged steering. *See A&E*, Doc. 293 at 21 ("Plaintiffs offer even less 'evidence' of an agreement to boycott than they did of an agreement to fix prices."). The FAC offers no facts to support the claim that 56 different insurers agreed to refuse to deal with Plaintiff in hundreds or thousands of transactions, much less any detail about when, how, or with whom agreements were or could have been made. Its only basis to support the existence of such an agreement – generalized allegations that Defendants allegedly steered business away from Plaintiff in the months or years after Plaintiff dissociated from one Defendant's direct repair program (in 2007) and therefore must have engaged in the steering to punish Plaintiff (FAC ¶ 337-38) – is a speculative interpretation based on clearly insufficient allegations of parallel conduct.

## III. PLAINTIFF'S CLAIM FOR TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS (COUNT THREE) SHOULD BE DISMISSED.

Plaintiff's claim for tortious interference with business relations fails as a matter of law. Louisiana recognizes only a narrow cause of action for tortious interference with business relations. *See, e.g.*, *Junior Money Bags, Ltd. v. Segal*, 970 F.2d 1, 11 (5th Cir. 1992) (tortious interference with business relations is a "very limited form of recovery" in Louisiana). "Louisiana jurisprudence has viewed [such a claim] with disfavor." *JCD Mktg. Co. v. Bass Hotels & Resorts, Inc.*, 812 So. 2d 834, 841 (La. Ct. App. 2002). To state a claim for tortious interference with business relations, a plaintiff must allege that the defendant "acted with actual malice" and that the defendant "actually prevented the plaintiff from dealing with a third party." *Henderson v. Bailey Bark Materials*, 116 So. 3d 30, 37 (La. Ct. App. 2013).

As this Court has stated, "Louisiana courts have explained that the malice element requires that the plaintiff show that the defendant's conduct was motivated by 'spite,' 'ill will,' or 'bad feelings,' rather than the pursuit of profits."[11]  (Doc. 30 at 14.)  Louisiana "does not appear to allow tortious interference claims based on improper means alone."  (*Id.*)

In dismissing the Original Complaint, the Court stated that Plaintiff "ha[s] not alleged facts showing that Defendants 'prevented' any identifiable third party from entering into a business relationship with . . . Plaintiff that would have been consummated but for the interference" and that Plaintiff had alleged only "generalized interference in the plaintiff's business interests."  (*Id.* at 16.)  In the FAC, Plaintiff has made no effort to remedy that deficiency except by including a single alleged specific instance of purported tortious interference involving one Defendant, State Farm.  (FAC ¶¶ 312, 458.)  Given the Court's requirement of specific pleading by Plaintiff against each Defendant, all of Plaintiff's tortious interference claims against Defendants other than State Farm fail as a matter of law. (*See* Doc. 30 at 14-16.)

Moreover, Plaintiff's claim of purported tortious interference by State Farm does not include allegations that would support the element of malice. (*See* FAC ¶¶ 312, 458.)  Plaintiff alleges that Steve Cambre, the insured, "spoke to a representative of State Farm" who "was very intimidating and told him he had to go to a repair shop on State Farm's 'preferred provider plan'" and that thereafter Mr. Cambre took his car to a preferred provider, Ray

---

[11] "It has been extremely difficult for plaintiffs to bear the burden of showing that bad feelings rather than just profit motivated the defendant; '[i]n fact, there appear to be no reported cases in which anyone actually has been held liable for the tort'" under Louisiana law.  *Ocean Mexicana, S.A. de C.V. v. Cross Logistics, Inc.*, 2014 WL 2441103, at *5 (E.D. La. May 30, 2014) (citation omitted).

Brandt Collision, "and not to Southern Collision." (*Id.*) Nothing in these allegations shows that State Farm was motivated by spite, ill will, or bad feelings directed toward Southern Collision. Thus, Plaintiff's bare-boned description of this transaction does not support an inference that State Farm's representative acted out of anything other than a profit motive to support State Farm's DRP network. That alleged conduct does not support a claim for tortious interference as under Louisiana law. (*See* Doc. 30 at 14 (citing *Bogues v. La. Energy Consultants, Inc.*, 71 So. 3d 1128, 1135 (La. Ct. App. 2011)).)[12]

Plaintiff's generalized, conclusory allegations of malice (FAC ¶¶ 119, 313-30), which are similar to those in the Original Complaint, do not remedy the deficiency in pleading malice. Most of these allegations do not name specific Defendants, but attribute "malice" to Defendants generically. As such, they are insufficient as a matter of law. (*See* Doc. 30 at 14-16.) For example, in the FAC, Plaintiff alleges that "Defendants . . . interfer[e] with Plaintiff's current and prospective business relations by intentionally misrepresenting and making knowingly false statements regarding the quality, efficiency and ethical reputation of Plaintiff's business." (FAC ¶ 119; *cf.* Original Complaint ¶ 71.) None of the conduct set forth in this generalized allegation, however, is supported by anything in Plaintiffs' allegations regarding the purported interference with Plaintiff's transaction with Mr. Cambre.

The FAC also asserts that "the malicious nature of Defendants' actions is evident through their refusal to pay the full cost of repairs, either by refusing to pay the posted labor rates, refusing to pay for necessary procedures or processes, utilizing salvaged parts or after-

---

[12] As this Court has acknowledged, allegations of the use of "improper means" is not sufficient under Louisiana law to state a claim for tortious interference. (Doc. 30 at 14.)

market parts instead of OEM parts designed to fit a particular vehicle, capping paint and materials or similar activities, or a combination of these actions." (FAC ¶ 314.) This allegation, framed in the disjunctive, does not permit any particular Defendant to know which of the alleged acts it is supposed to have engaged in. Moreover, this and the many other such allegations have no bearing on malice for purposes of Plaintiff's tortious interference claims. This allegation describes conduct in repair transactions with Plaintiff, not conduct attempting to prevent insureds from dealing with Plaintiff. In addition, the allegation clearly describes conduct aimed at reducing Defendants' costs for repairs. As noted above, such profit-related conduct does not support a tortious interference claim as a matter of Louisiana law. (*See* Doc. 30 at 14 (citing *Bogues,* 71 So. 3d at 1135).)

Plaintiff's other generalized allegations are equally unavailing. For example, Plaintiff complains about statements by Defendants to their insureds that they guarantee repairs done by DRP shops. Plaintiff alleges that these statements are "misleading" because they supposedly imply that Plaintiff does not offer its own guarantees. (FAC ¶ 320-21.) However, Plaintiff does not allege any statement by an insurer that non-DRP body shops do or do not guarantee their work, nor does Plaintiff identify any insured who was misled in the manner alleged. Likewise, Plaintiff's allegations that the Defendants do not really offer guarantees because they offer them through their DRP shops (*id.* ¶ 321) simply do not support a claim for tortious interference. Similarly, although Plaintiff points to statements by insurers that it may "take longer" to get a repair done in their shops, Plaintiff does not allege that it is untrue that there may be delays in repairs at non-DRP shops, as compared to DRP shops. Rather, Plaintiff conclusorily lays the blame for the delays on Defendant insurers. (*Id.* ¶ 316.) How-

22

ever, Plaintiff provides no factual basis for its conclusory allegations that any differences in the time required for insurers' inspections of damaged cars and/or approvals of repair estimates at non-DRP shops and DRP shops result from malice towards non-DRP shops, rather than from the efficiencies arising from the arrangements between DRPs and insurers.  In addition, Plaintiff's allegations that insureds were told that, if they went to non-DRP shops, they might have to pay for repair charges that were not deemed reasonable by the insurer, accurately reflect the standard coverage provided by auto insurance policies.  *See, e.g.*, *Quality Auto Body*, 660 F.2d at 1204 ("'the only consequence of a refusal to perform the work at [the price offered by the insurer] is that the customer will have to pay the additional charge himself . . .'" (citation omitted)).[13]

For all these reasons, Plaintiff's claim for tortious interference with business relations fails as a matter of Louisiana law and should be dismissed with prejudice.

## IV. PLAINTIFF'S CLAIM FOR UNJUST ENRICHMENT (COUNT FOUR) SHOULD BE DISMISSED.

Plaintiff's second attempt to plead an unjust enrichment claim fails to plausibly allege required elements of an unjust enrichment claim.  First, Plaintiff has not plausibly pled the essential element of "an enrichment on the part of the defendant."  *See Edwards v. Conforto*, 636 So. 2d 901, 907 (La. 1994).  Under the guise of group pleading, the FAC alleges that the repairs Plaintiff performed "benefitted and enriched Defendants and Defendants'

---

[13] In alleging malice, Plaintiff also improperly relies on an affidavit submitted in *Price's Collision Center, LLC v. Progressive Hawaii Insurance Co.*, a case pending in Tennessee, not Louisiana. (FAC ¶¶ 326-28.)  As Plaintiff concedes, Progressive Hawaii, the defendant in *Price's*, is not a Defendant here.  Plaintiff's blanket allegation that other Progressive entities "have acted in the same manner as set out in Mr. Edwards' affidavit" (*id.* ¶ 328) is unsupported by any specific allegations of such acts by those other entities and does not show malice by Progressive or any other Defendant.

insured/claimants for whom Defendants are required to provide payment for repairs." (FAC ¶ 469.)[14]   However, the FAC makes clear that the purported benefit – repairs to motor vehicles – was furnished by Plaintiff not to Defendants but rather to their insureds "by providing to these policyholders and claimants motor vehicle collision repair services." (*Id.* ¶ 116.)   As the Court has stated, "the repairs [of insureds' vehicles] at issue obviously provided a benefit to the owners of the vehicles.   But so far as the Amended Complaint discloses, the only effect of such a repair on the insurance company is the incurring of an obligation to pay for it." (*A&E*, Doc. 293 at 9.)   An obligation to pay is hardly a benefit to the Defendant insurers or enrichment. (*Id.*)[15]

Second, Plaintiff cannot establish the essential element of an "impoverishment" of the Plaintiff. *See Edwards*, 636 So. 2d at 907.   "[I]mpoverishment can be shown 'only when the factual circumstances show that the impoverishment was not a result of the plaintiffs' own fault or negligence or was not undertaken at [their] own risk.'" *Dorsey v. N. Life Ins. Co.*, 2005 WL 2036738, at *23 (E.D. La. Aug. 15, 2005) (citation and emphasis omitted).

Here, according to the FAC itself, Defendants made clear to auto body shops the amounts they were willing to pay for the services to be rendered. (*See, e.g.*, FAC ¶¶ 179-81, 185-87, 191-97.)   Moreover, Plaintiff's allegations make clear that the same or similar DRP

---

[14] Plaintiff's reliance on impermissible group pleading flatly contravenes the Court's Orders directing plaintiffs in the MDL cases to provide "individualized allegations" to support their state law claims such as unjust enrichment. (*See A&E*, Doc. 110 ¶ 4; *A&E,* Doc. 293 at 6 & n.8.)  In its FAC, Plaintiff entirely fails to provide the individualized factual allegations necessary to show that the elements of unjust enrichment are met with respect to any of the individual repair transactions at issue. Plaintiff's continued failure to plead with the required specificity warrants dismissal of its unjust enrichment claim for this reason alone.

[15] Moreover, even to the extent that an obligation to pay could be construed as a "benefit," it is "certainly not something that has been conferred . . . by the repair shop." (*A&E*, Doc. 293 at 10.)

agreements and pricing practices have existed for many years and have been well known to body shops. (*See, e.g.*, *id.* ¶¶ 172-79, 406-17.) There can be no plausible claim that, when Plaintiff took on the work, it expected higher payments than they received.

As the Court concluded in *Indiana AutoBody*, "[a]ccepting as true the facts alleged here by the Plaintiff[] – essentially that [it] agreed to perform repairs at certain prices, and that [it] knew that the Defendants had always refused to pay more than those prices – the Plaintiff[] could not, under any level of reasonableness, have expected to be paid more than what [it] received." (*Indiana AutoBody*, No. 6:14-cv-06001, Doc. 150 at 2.) Thus, "[i]f Plaintiff[] w[as] unhappy with the prices Defendants were paying, [Plaintiff] could have negotiated higher prices before performing the repairs or failing that, refused to perform repairs for Defendants' insureds." (*Capitol Body*, No. 6:14-cv-06000, Doc. 82 at 10, *adopted*, Doc. 83.) Plaintiff chose to keep performing repairs for Defendants' insureds despite "kn[owing] Defendants would not pay what [it] w[as] asking for." (*In re: Auto Body Shop Antitrust Litig.*, No. 6:14-md-2557, Doc. 192 (Report & Recommendations) at 26.)

Accordingly, Plaintiff cannot show the element of unwarranted "impoverishment," and its unjust enrichment claim should be dismissed for this additional reason.

## V.   CONCLUSION

After two tries, it is apparent that any further amendment of Plaintiff's FAC would be futile. The Court should dismiss all of Plaintiff's claims against Defendants with prejudice. *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005); *Postell v. Fifth Third Bank*, 2013 WL 2042805, at *1 (M.D. Fla. May 15, 2013) (amended complaint dismissed with prejudice where it failed to cure identified deficiencies in prior complaint).

101337245.1

Dated:  June  17, 2015

Respectfully submitted,

*/s/ Johanna W. Clark*
Johanna W. Clark
CARLTON FIELDS JORDEN BURT, P.A.
450 S. Orange Ave., Suite 500
Orlando, Florida 32801
Telephone: (407) 849-0300
Facsimile: (407) 648-9099
Email: jclark@cfjblaw.com

Michael L. McCluggage
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Telephone: (312) 660-7600
Facsimile: (312) 692-1718
E-mail: mmcluggage@eimerstahl.com

Michael P. Kenny
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: 404-881-7000
Facsimile: 404-881-7777
Email: mike.kenny@alston.com

*Attorneys for Defendants State Farm Mutual*
*Automobile Insurance Company, State Farm*
*Fire and Casualty Company, and State*
*Farm General Insurance Company*

/s/ Richard L. Fenton
Richard L. Fenton (admitted pro hac vice)
Mark L. Hanover (admitted pro hac vice)
Dentons US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Tel: (312) 876-8000
Fax: (312) 876-7934
Email: richard.fenton@dentons.com
Email: mark.hanover@dentons.com

Bonnie Lau
Dentons US LLP
525 Market Street, 26th Floor
San Francisco, CA 94105-2708
Telephone: (415) 882-5000
Facsimile: (415) 882-0300
Email: bonnie.lau@dentons.com

Lori J. Caldwell (Florida Bar No. 026874)
Rumberger, Kirk & Caldwell, PA
300 S Orange Ave. Suite 1400
PO Box 1873
Orlando, FL 32802-1873
Tel. (407) 839-4511
Fax: (407) 835-2011
Email: lcaldwell@rumberger.com

*Attorneys for Defendants Allstate Property and Casualty Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Insurance Company, Encompass Indemnity Company, Encompass Insurance Company of America, Encompass Property and Casualty Company, and Esurance Insurance Company*

*/s/ Hal K. Litchford*                                  
Hal K. Litchford (272485)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
SunTrust Center
200 South Orange Avenue
Post Office Box 1549
Orlando, Florida  32802
Telephone:  (407) 422-6600
Facsimile: (407) 841-0325
Email:  hlitchford@bakerdonelson.com

     -and-

Amelia W. Koch (Admitted Pro Hac Vice)
Steven F. Griffith, Jr. (Admitted  Pro  Hac
Vice)
BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana  70170
Telephone:  (504) 566-5200
Facsimile: (504) 636-4000
Email:  akoch@bakerdonelson.com
Email:  sgriffith@bakerdonelson.com

*Attorneys for Defendants USAA Casualty
Insurance Company and USAA General
Indemnity Company*

/s/ E.K. Cottrell
E.K. Cottrell (Fla. Bar No: 0013579)
SMITH, GAMBRELL & RUSSELL, LLP
50 N. Laura Street, Suite 2600
Jacksonville, FL  32202
Telephone:   (904) 598-6100
Facsimile:   (904) 598-6300
Email:  ecottrell@sgrlaw.com

*Attorneys for Defendants Sentry Insurance A Mutual Company and Sentry Select Insurance Company*

/s/ Timothy J. Rooney
Timothy J. Rooney (admitted pro hac vice)
Norman K. Beck (admitted pro hac vice)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
Email:  trooney@winston.com
Email:  nbeck@winston.com

Laura Besvinick
Fla. Bar No. 391158
STROOCK & STROOCK & LAVAN LLP
200 South Biscayne Boulevard
Suite 3100
Miami, Florida 33131
Telephone: (305) 789-9300
Facsimile: (305) 789-9302
Email:  lbesvinick@stroock.com

*Attorneys for Defendants Travelers Casualty and Surety Company, Travelers Casualty and Surety Company of America, Travelers Casualty Insurance Company of America, The Travelers Indemnity Company of America, The Travelers Indemnity Company of Connecticut, The Travelers Indemnity Company, and Travelers Property Casualty Company of America*

101337245.1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of June, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record that are registered with the Court's CM/ECF system.

*/s/ Johanna W. Clark*
Johanna W. Clark

101337245.1