**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

SOUTHERN COLLISION &
RESTORATION, LLC,

    Plaintiff,

v.                                                                        Case No: 6:14-cv-6005-Orl-31TBS

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, et al.,

    Defendants.

## ORDER

This matter comes before the Court on motions to dismiss (Doc. 37, 41, 42, 45) filed by various groups of Defendants, the responses in opposition (Doc. 58, 59) to those motions filed by the Plaintiff, and the replies (Doc. 60-63) filed by the movants.   The portions of those motions having to do with the Plaintiff's state law claims have been referred to Magistrate Judge Smith for disposition by way of a report and recommendation.   Accordingly, this order will address only the portions of those motions that deal with the Plaintiff's claims under federal law.

**I.**    **Background**

The instant case is one of 24 similar actions, consolidated for pretrial purposes, in which auto repair shops have accused insurance companies in their particular states of violating Section 1 of the Sherman Antitrust Act and various state laws by conspiring to suppress the amounts they are obligated to pay for automobile repairs.   The lead case among these actions – henceforth, the "Florida Action" – was filed in this court in February 2014.   The initial complaint in that case was dismissed *sua sponte* in June 2014 on the grounds that it was a prohibited "shotgun" pleading, that it failed to properly set forth the basis for the Court's jurisdiction, that it failed to identify which

parties had ongoing contracts with one another, and that all of the alleged misdeeds were attributed, collectively, to every Defendant, even where such collective attribution made no sense. (Doc. 110 at 1-2 in Case No. 6:14-cv-310-Orl-31TBS).

The plaintiffs in the Florida Action filed an amended complaint later that same month. (Doc. 167 in Case No. 6:14-cv-310-Orl-31TBS).  Subsequently, various defendants moved to dismiss.  In January 2015, this court granted those motions in part, dismissing all the claims in the Florida Action, some with prejudice.  (Doc. 291 in Case No. 6:14-cv-310-Orl-31TBS).  The Sherman Act claims in that case – one for price-fixing, and one for an illegal boycott – were dismissed because the Florida Action Plaintiffs had failed to adequately plead the existence of an agreement and had failed to adequately allege a concerted refusal to deal, respectively.  (Doc. 291 at 20-21 in Case No. 6:14-cv-310-Orl-31TBS).  After another amended complaint and another round of motions to dismiss, the Court dismissed the Florida Action with prejudice in September 2015.  (Doc. 341 in Case No. 6:14-cv-310-Orl-31TBS).  In regard to the antitrust claims, the court again found that the plaintiffs had failed to adequately allege the existence of an agreement or a concerted refusal to deal.  (Doc. 341 at 20-21 in Case No. 6:14-cv-310-Orl-31TBS).  The plaintiffs in the Florida Action did not appeal that dismissal.[1]

The instant case was filed in the United States District Court for the Eastern District of Louisiana in August 2014.  (Doc. 1).  On September 16, 2014, the United States Judicial Panel on Multidistrict Litigation transferred the case to this Court.  (Doc. 16).  Subsequently, the three original Defendants – State Farm Mutual Automobile Insurance Company, State Farm Fire &

---

[1] As of the date of this order, of the 24 actions in these consolidated proceedings, the Florida Action and five others have been dismissed and not appealed; one was remanded; five were appealed but had the appeals dismissed for lack of prosecution; and twelve remain pending before this court.

Casualty Company, and State Farm General Insurance Company (henceforth, collectively, "State Farm") – filed a motion to dismiss (Doc. 19).

On March 10, 2015, Magistrate Judge Smith entered a Report and Recommendation (Doc. 30) that all of the claims asserted in the Complaint be dismissed, some with prejudice.   On April 27, 2015, the Court adopted the Report and Recommendation.   (Doc. 34).   The Plaintiff filed an Amended Complaint (Doc. 36) (henceforth, the "FAC") that, *inter alia*, added dozens of additional Defendants; in response, various groups of Defendants filed the motions that are the subject of this order.

## II.     Legal Standards

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief" so as to give the defendant fair notice of what the claim is and the grounds upon which it rests, *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957), *overruled on other grounds*, *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A Rule 12(b)(6) motion to dismiss for failure to state a claim merely tests the sufficiency of the complaint; it does not decide the merits of the case. *Milbum v. United States*, 734 F.2d 762, 765 (11th Cir.1984). In ruling on a motion to dismiss, the Court must accept the factual allegations as true and construe the complaint in the light most favorable to the plaintiff. *SEC v. ESM Group, Inc.*, 835 F.2d 270, 272 (11th Cir.1988). The Court must also limit its consideration to the pleadings and any exhibits attached thereto. Fed. R. Civ. P. 10(c); *see also GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993).

The plaintiff must provide enough factual allegations to raise a right to relief above the speculative level, *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1966, and to indicate the presence of the required elements, *Watts v. Fla. Int'l Univ*., 495 F.3d 1289, 1302 (11th Cir. 2007). Conclusory

allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal. *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009), the Supreme Court explained that a complaint need not contain detailed factual allegations, "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id*. 678, 129 S.Ct. at 1949 (internal citations and quotations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the plaintiff is entitled to relief.'" *Id.* at 679, 129 S.Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

### III.    Analysis

According to the allegations of the FAC, which are accepted in pertinent part as true for purposes of resolving the instant motions, the Plaintiff is a Louisiana automobile repair shop; the Defendants are a group of 57 insurers who, collectively, write more than 85 percent of the private passenger automobile policies in that state.   (FAC at 4-17, 19).   The Plaintiff contends that the Defendants have engaged

> in an ongoing, concerted and combined intentional course of action and conduct to improperly and illegally control and depress automobile damage repair costs to the detriment of the Plaintiff and the substantial profit of the Defendants.

(FAC at 18).

The Plaintiff goes on to assert that the Defendants have

> intentionally combined to utilize their aggregated market power to exert control over every aspect of the collision repair industry, including but not limited to price fixing of labor rates, price fixing of replacement parts, compulsory use of substandard or dangerous

> replacement parts, compulsory use of a parts procurement program which directly financially benefits State Farm Defendants and indirectly benefits the remaining Defendants, boycotting shops which refuse to comply with either fixed prices or use of substandard or improper parts, and interfering with Plaintiff's current and prospective business relations by intentionally misrepresenting and making knowingly false statements regarding the quality, efficiency and ethical reputation of Plaintiff's business, exerted economic duress and coercion upon both the Plaintiff to capitulate and upon consumers, including direct threats to consumers to refuse coverage or portions of available coverage if consumers persist in their efforts to patronize Plaintiff's business.

(FAC at 18-19).

Simply stated, the Plaintiff complains that all of the Defendants pay Louisiana automobile repair shops (on behalf of the Defendants' insureds or claimants) essentially the same hourly rates for repairs, painting and the like.   Those rates, the Plaintiff alleges, are based on market surveys performed by State Farm.   (FAC at 38-39).   The Plaintiff alleges that State Farm manipulates or fakes the survey results, producing bogus "market rates" that are below the rates actually prevailing in the marketplace.   (FAC at 40-42).   State Farm insists that it is only willing to pay these bogus market rates, and the other Defendants insist on paying no more than State Farm pays.   (FAC at 41).

In addition, the Plaintiff alleges that the Defendants have a list of repair procedures for which they all refuse to pay, even when that particular procedure is recommended by the industry's leading repair-estimating databases, (FAC at 41-49), and that the Defendants insist that the shops use cheaper (and lower-quality) parts when performing repairs, (FAC at 51-55). Finally, the Plaintiff contends that when repair shops balk at any of this, such as by trying to raise their hourly rates or utilize higher-quality parts, they are subject to boycotts in the form of having the Defendants' insureds "steered" away from their shops to compliant shops.   (FAC at 55-57).

### A. Count One – Price Fixing

In Count One, the Plaintiff alleges that the Defendants and unnamed co-conspirators have entered into an agreement "to control and suppress automobile damage repair costs [and] automobile material repair costs through coercion and intimidation" of the Plaintiff, all in violation of the Sherman Act, 15 U.S.C. §1 *et seq.*  (FAC at 79).  Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States."  While § 1 could be interpreted to bar every agreement in restraint of trade, the Supreme Court has long recognized that Congress intended to outlaw only unreasonable restraints.  *See*, *e.g.*, *Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332, 342-43, 102 S.Ct. 2466, 2472-73, 73 L.Ed.2d 48 (1982) (citing *United States v. Joint Traffic Assn.*, 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259 (1898)).  Even where a restraint of trade is unreasonable, it is only prohibited if it was effected by a contract, combination or conspiracy.  *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775, 104 S.Ct. 2731, 2743, 81 L.Ed.2d 628 (1984).  Because of this, the "crucial question" in § 1 cases is whether the challenged anticompetitive conduct "stems from independent decision or from an agreement, tacit or express."  *Twombly*, 550 U.S. at 553, 127 S.Ct. at 1964 (alterations and citations omitted).

<u>Conscious Parallelism</u>

As is the norm in antitrust cases, the Plaintiff here offers no direct evidence that the Defendants have entered into a price-fixing agreement, instead relying on allegations of parallel behavior.  A showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, but it falls short of conclusively establishing agreement or itself constituting a Sherman Act offense.  *Twombly*, 550 U.S. at 553, 127 S.Ct. at 1964 (citations omitted).  Because of this, stating a claim under Section 1 of the Sherman Act requires

"a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965.

The actions allegedly taken by the Defendants in this case, such as paying the same labor rates, refusing to pay for the same list of procedures, and requiring the use of lower-quality parts, are not enough, on their own, to constitute a violation of Section 1 of the Sherman Act. Evidence of conscious parallelism[2] alone does not permit an inference of conspiracy unless the Plaintiff either (1) establishes that, assuming there is no conspiracy, each defendant engaging in the parallel action acted contrary to its economic self-interest or (2) offers other "plus factors" tending to establish that the defendants were not engaging merely in oligopolistic price maintenance or price leadership but rather in a collusive agreement to fix prices or otherwise restrain trade. *Harcros Chemicals*, 158 F.3d at 570-71.

In *Twombly*, the Supreme Court noted a number of "plus factors," identified by commentators (and the parties in that case) that could support a plausible inference of such a collusive agreement, including: "parallel behavior that would probably not result from chance,

---

[2] The Supreme Court has defined conscious parallelism as a "process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227, 113 S.Ct. 2578, 2590, 125 L.Ed.2d 168 (1993). In other words, conscious parallelism is the practice of interdependent pricing in an oligopolistic market by competitor firms that realize that attempts to cut prices usually reduce revenue without increasing any firm's market share, but that simple price leadership in such a market can readily increase all competitors' revenues.

*City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 570 (11th Cir. 1998).

coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties;" conduct indicating "restricted freedom of action and sense of obligation that one generally associates with agreement;" or "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason." *Twombly*, 550 U.S. at 556 n.4, 127 S. Ct. at 1965 n. 4 (internal citations omitted).

Thus, in addition to setting out the Defendants' uniform conduct, the Plaintiff must provide enough factual matter, taken as true, to show that the Defendants took steps that would otherwise have been against their economic self-interest or that tends to show collusion.

> The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief." A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory.

*Twombly*, 550 U.S. at 557, 127 S. Ct. at 1966.

### Acting Against Self-Interest

The Plaintiff contends that it has satisfied the requirement of pleading facts that show that a collusive agreement exists among the Defendants because it has alleged that, in addition to engaging in parallel behavior, the Defendants have taken actions that would have been against their economic self-interest in the absence of a conspiracy. Specifically, the Plaintiff argues that

> Any insurer which, as a regular and routine part of business, refused to fully and properly repair the vehicles of their respective insureds and claimants would soon find itself out of business. Only through agreement, by uniting and declaring these actions as the "industry standard" can Defendants' actions succeed.

(Doc. 134 at 9).

This argument fails for several reasons, not the least of which is that this assertion is not consistent with the allegations set forth in the First Amended Complaint: The Plaintiff has not alleged that it (along with the other repair shops in the state) has been systematically failing to "fully and properly repair" the vehicles of any customers who happen to be insured by (or making a claim against) one of the 57 insurance companies that are being sued in this case. Beyond this failure of pleading, the refusal to pay for all of the services the Plaintiffs think should be provided and for the top-quality parts and materials the Plaintiffs think should be utilized is simply the buyer-side version of the profit-maximizing behavior described approvingly by the Supreme Court in the *Brooke Group* case and by the Eleventh Circuit in *Harcros Chemicals*. (See note 2, *supra*.) If the oligopoly has market power – as alleged in this case – then it is consistent with that power for its members to observe price parity. The possible eventual loss of customers resulting from such a practice is nothing more than speculation. *See Twombly*, 550 U.S. at 567-68 (rejecting argument that defendants' failure to compete in each other's geographic areas was suggestive of conspiracy to restrain trade where plaintiff had no support for allegation that such competition would have proven lucrative and reluctance to expand beyond existing areas could be explained by legitimate concerns). *Compare Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33 (1st Cir. 2013) (finding that plaintiff successfully pled that defendants acted against their own interests in refusing to do business with plaintiff, where successful pilot programs showed that participation in plaintiff's recycling enterprise would have been cost-neutral to defendants and would have increased sales to defendants' customers).

Plus Factors

The Plaintiff also argues that the First Amended Complaint contains numerous allegations that, taken as true, establish the existence of "plus factors" that support a plausible conclusion that

the Defendants have entered into a collusive agreement.  For brevity's sake, the Court quotes the Plaintiff's assertions as to each purported plus factor and then addresses each assertion:

> Market Power: Collectively, the named Defendants hold at least eighty-five percent (85%) but more likely at least ninety percent (90%) of the private passenger insurance market within the State of Louisiana.

(Doc. 59 at 9).

The Plaintiff offers no explanation as to how the possession of market power itself can constitute a "plus factor."  The fact that a group of alleged price-fixers possess power in a particular market does not, standing alone, make it more likely that the members of that group have entered into an agreement to fix prices.  While such an agreement would likely be pointless if the participants lacked the muscle to enforce it, the mere (collective) possession of market share is not suggestive of collusion.

> Motive: The Defendants shared a motive to conspire, profit. As the profit in this case reaches the billions of dollars, the motive is substantial.  Additionally, the Defendants substantially benefit through their combination or conspiracy as they jointly profit through their mutual investments through BlackRock, Inc., in the same companies to which they steer business, provide materials at deep discount and otherwise coordinate and act in concert by agreement.  Defendants would be unable to achieve the record profits reported without the coordinated and agreed upon actions.

(Doc. 59 at 9).

The mere desire to make a profit cannot constitute a "plus factor," because conscious parallelism is itself a profit-maximizing behavior.  *See Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1342 (11th Cir. 2010) ("Jacobs had the burden to present allegations showing why it is more plausible that TPX and its distributors . . . would enter into an illegal price-fixing agreement . . . to reach the same result realized by purely rational profit-maximizing behavior.").

In addition, because the motive behind most (if not all) price-fixing agreements is to increase profits among the participants, adopting "profit motive" as a plus factor would effectively eliminate any pleading requirements regarding such agreements.  If the existence of a profit motive was enough to make it plausible that the defendants had colluded to fix prices, then essentially every alleged price-fixing agreement would survive a motion to dismiss.

The Plaintiff's second argument on this point – involving "BlackRock, Inc." (henceforth, "BlackRock") – is difficult to follow.  It appears that the Plaintiff is arguing (1) that the Defendants are invested in BlackRock, (2) that BlackRock owns some businesses to which the Defendants steer their insureds and to which they provide discounted materials, and (3) that somehow this contributes to the Defendants earning record profits.  This argument fails for numerous reasons.  First, it appears to be another version of the profit-motive-as-plus-factor argument, which fails for the reasons set forth above.  Second, the details of the financial relationship between the Defendants and BlackRock – an asset management firm – are mostly incomprehensible, especially in regard to how the Defendants might profit from that arrangement.

The Plaintiff alleges that "Defendants State Farm, Allstate, Nationwide, USAA, SAFECO, and GEICO are all invested in or through BlackRock".[3]  (FAC at 69).  The Plaintiff alleges that Blackrock holds majority ownership of Service King, "a collision repair multi-shop operator," which in turn owns MSO Sterling Collision Centers ("Sterling").  (FAC at 70).  The Plaintiff alleges that the Defendants earn extra profit by steering repairs to Service King or Sterling, in that those repair shops accept lower payments for repairs and because BlackRock prospers when those entities do additional business.  (FAC at 70).  However, the Plaintiff does not allege that Service

---

[3] Numerous Defendants in this case have names that include "Allstate," "Nationwide," "USAA," "Safeco," or "GEICO".  The Plaintiffs do not specify which of these Defendants they intended to reference.

King or MSO Sterling charge a lower price to the Defendants than other repair shops in the area do. And it is not apparent how an entity that has invested *through* BlackRock would profit just because a company partially owned by BlackRock does more business. Assuming *arguendo* that at least some Defendants have an ownership interest in BlackRock (and therefore would share in the profits of a business partially owned by Blackrock), sending customers to Service King or Sterling repair shops would be in those Defendants' self-interest, even in the absence of any agreement with other Defendants to do so.[4] The Court also notes that, although the Plaintiff includes an incident of alleged "steering" in the FAC, it does not allege that the shop to which its customer was steered was either a Service King or Sterling shop, much less that it was done for that reason. *See* FAC at 57. Thus the Plaintiff's allegations regarding Blackrock, accepted as true, do not make it any more likely that the Defendants entered into an agreement in violation of Section I of the Sherman Act.

> <u>Opportunity to conspire</u>: The Defendants have numerous opportunities to conspire through their membership in trade associations (which, in turn, regularly work together), involvement with purported beneficent organizations (e.g., IIHS) and similar organizations.

(Doc. 59 at 9).

It is not clear from the allegations of the Second Amended Complaint that all of the Defendants belong to any of the trade associations or beneficent organizations referred to in that document, much less that all of them belong to the same association or organization. Regardless, participation in trade associations and similar organizations provides no indication of a conspiracy. *See American Dental Association v. Cigna Corp.*, 605 F.3d 1283, 1295 (11th Cir. 2010).

---

[4] The Plaintiffs also do not offer an explanation as to why Defendants without an ownership interest in Blackrock would agree to send their insureds and claimants to Service King or Sterling or try to encourage this behavior by Defendants with such an ownership interest.

In light of the foregoing, the Court finds that the Plaintiff has again failed to state a claim for price-fixing in violation of Section 1 of the Sherman Act.

### B.     Count Two – Boycott

In Count Two, the Plaintiff asserts that the Defendants have attempted to coerce auto repair shops into going along with their price-fixing scheme by

> multiple forms of illegal boycott activity including, *inter alia*, steering actual and potential customers away from Plaintiff through knowing dissemination of false and misleading statements about Plaintiff; manipulating delays and obstacles in approving, obtaining and paying for repairs obtained from Plaintiff; economically coercive threats that use of Plaintiff's services will incur additional and greater out-of-pocket costs to customers; alteration and manipulation of the Defendants' referral and rating systems to limit or otherwise influence customer access to service providers.

(FAC at 85).

The generic concept of "boycott" refers to a method of pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target. *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541 (1978).   The Defendants argue, *inter alia*, that the Plaintiff's boycott claim must be dismissed because the Plaintiff has again failed to allege conduct that would constitute a concerted refusal to deal – the same reason the previous boycott claim was dismissed.  *See*, *e.g.*, Doc. 45 at 2.  At best, the Defendants argue, the Plaintiff has included in the First Amended Complaint some allegations that a particular insurer steered its insured from a shop operated by one of the Plaintiffs to a different shop that had a relationship with the insurer.   (Doc. 45 at 2).

The Court also notes that there are no allegations in the Second Amended Complaint that any Defendant (much less all of them) has ever refused to do business with the Plaintiff.   The Plaintiff does include an allegation that State Farm steered one of its insureds from the Plaintiff's shop to a shop on State Farm's "preferred provider plan".   (FAC at 57).   This is far from enough

- 13 -

to state a boycott claim, however, as the steering involved but a single Defendant, and there are no allegations that the steering occurred because the repair shop originally chosen by the insured was attempting to obtain a higher reimbursement rate or anything of that nature.

The Plaintiff has again failed to allege facts suggesting a concerted refusal to deal, as required to state a boycott claim under Section 1 of the Sherman Act.

### IV.     Conclusion

The Plaintiff has had multiple attempts to state an antitrust claim. Based upon a review of the pleadings in this and the other 20-odd consolidated cases – the vast majority of which share the same shortcomings – the Court finds that giving the Plaintiff another opportunity to state a claim would be an exercise in futility.   Accordingly, both antitrust claims will be dismissed with prejudice.   In consideration of the foregoing, it is hereby

**ORDERED** that the motions to dismiss (Doc. 37, 41, 42, 45) are **GRANTED** as to the antitrust claims, and Counts One and Two are **DISMISSED WITH PREJUDICE.**

**DONE** and **ORDERED** in Chambers, Orlando, Florida on March 24, 2016.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party